**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

WILBERT HANNAH,                     :
                                    :
              Petitioner,           :          Civil Action No. 04-2497 (WHW)
                                    :
       v.                           :
                                    :                    **OPINION**
ROY L. HENDRICKS, et al.,           :
                                    :
              Respondents.          :

**APPEARANCES:**

      WILBERT HANNAH, Petitioner <u>Pro Se</u>
      SBI #266348/417080B
      New Jersey State Prison
      P.O. Box 861
      Trenton, New Jersey 08625

      NATALIE ANN SCHMID DRUMMOND, ESQ.
      Office of the N.J. Attorney General
      Division of Criminal Justice
      Richard J. Hughes Justice Complex
      P.O. Box 086
      Trenton, New Jersey 08625-0086
      Attorneys for Respondents

**WALLS, District Judge**

      This matter is before the Court on petitioner Wilbert
Hannah's application for habeas corpus relief under 28 U.S.C. §
2254. For the reasons stated below, the petition for habeas
relief will be denied for failure to make a substantial showing
of a federal statutory or constitutional deprivation.

## I.   BACKGROUND

### A.   Procedural History

Petitioner, Wilbert Hannah ("Hannah"), is presently confined at the New Jersey State Prison in Trenton, New Jersey.  Hannah was convicted by a jury in the Superior Court of New Jersey, Law Division, Hudson County on October 5, 1994, on two counts of felony murder, two counts of robbery, and a weapons charge.  On November 18, 1994, Hannah was sentenced to two consecutive life terms on the felony murder charges, each with a 30-year period of parole ineligibility.  The other charges were merged for sentencing purposes.

Hannah appealed his final judgment of conviction to the New Jersey Appellate Division.  In an unpublished per curiam Opinion decided December 11, 1997, the Appellate Division affirmed the conviction and sentence.  (Appellate Division Opinion, decided December 11, 1997, RE 19[1]).  The New Jersey Supreme Court denied certification on March 25, 1998.  (RE 22).

On June 17, 1998, Hannah filed a state post-conviction relief petition ("PCR"), which was denied by the court in which he was convicted on June 28, 2000, without an evidentiary hearing.  Hannah appealed.  On January 31, 2002, the Appellate Division affirmed in part, reversed in part and remanded for an

---

[1]  "RE" reflects the respondents' appendix submitted with their answer.  The appendix includes the relevant state court.

evidentiary hearing with respect to one of Hannah's claims alleging ineffective assistance of trial counsel.  Hannah filed a petition for certification to that part of Appellate Division's decision affirming denial of post-conviction relief.  The New Jersey Supreme Court denied certification on June 12, 2002.  (RE 35).

On April 11, 2002, an evidentiary hearing was conducted with respect to the remanded PCR claim.  The court denied the remaining claim on June 6, 2002.  Hannah appealed the decision, and the Appellate Division affirmed the denial of the remaining claim in an unpublished opinion filed on November 7, 2003.  The New Jersey Supreme Court denied certification on January 21, 2004.

Hannah filed this federal habeas petition on or about May 28, 2004.  The State responded on April 15, 2005, and provided this Court with the relevant state court record.

B.  Factual Background

The facts of this case were recounted below and this Court, affording the state court's factual determinations the appropriate deference under 28 U.S.C. § 2254(e)(1), will simply reproduce the New Jersey Appellate Division's factual recitation:

> The State presented evidence from which the jury could conclude defendant planned and carried out the killing of two drug dealers, Angel "Freddie" Salazar and Luis Flores, with the assistance of codefendant, William LaCue.  The police found Salazar and Flores dead in a car parked on Clinton Avenue, Jersey City, shortly after midnight on June

3

7, 1993.  Responding to a call from a taxi cab driver who
noticed two men in the parked car, the police discovered
both men had suffered fatal gunshot wounds.  Salazar's body
was in the driver's seat.  Flores' body was in a rear
passenger seat.  Autopsy reports disclosed Salazar had one
gunshot entrance wound to the head at his left temple with
an exit wound above his right ear.  Flores had four gunshot
wounds; three close range shots to the head and the fourth
to the shoulder.

The police found five shell casings in the vehicle.  The
casings in the front of the car were from a .10mm gun, while
those in the rear were from a .9mm.

Area residents' descriptions of men seen running from the
scene of the crime led police to LaCue, who wore his hair in
readily identifiable dredlocks.  LaCue led police to two
handguns, one a .9mm and the other a .10mm.  Ballistic tests
tied the crime scene shell casings to the two handguns.

LaCue, who pled guilty to aggravated manslaughter and armed
robbery, testified for the State.  LaCue told the jury that
a day prior to the killings defendant stated he had made
arrangements to purchase heroin.  Defendant, however, told
LaCue that, instead of purchasing the heroin, "he wasn't
going to pay them, he was going to rob them, and we was
going to shoot them."

Defendant supplied the handguns.  He gave LaCue the .10mm
and took the .9mm for himself.  They met Salazar and Flores
in their parked car on Clinton Avenue in Jersey City.  After
Salazar turned over the heroin, LaCue testified defendant
fired two shots at Salazar and LaCue fired two shots at
Flores.

Following the shooting, defendant and LaCue ran from the
scene.  Defendant removed his shirt and wrapped his gun in
it.  He told LaCue to get rid of both guns.

LaCue, after leaving defendant, gave the guns to his
brother.  He told his brother that defendant shot somebody
and to take the guns and hold them.  It was the brother who
produced the guns which led to the ballistic testing.

After the shooting, defendant made his way to the apartment
of his girlfriend and her sister.  The girlfriend, Hazel
Forrester, testified defendant came to her apartment with a
Maurice Thomas, also known as Mo-T.  Forrester testified

4

defendant told the sister he had just killed someone named
Fred. Forrester recognized the name "Fred" as someone who
would call her apartment periodically looking for defendant.
Later defendant told Forrester directly that he had to leave
because he had just killed Freddie.

After his arrest, LaCue gave the police four statements, the
first one oral and the latter three taped. In the oral
statement, LaCue stated he shot one of the victims while
defendant shot the other. In the initial two recorded
statements, which essentially mirrored each other, LaCue
contradicted the oral statement. In those statements, LaCue
said, "I got in the car and shot them, shot them both." One
of the police officers who took the statements testified
LaCue "froze up" before each of the first two taped
statements.

In the third statement, LaCue admitted both he and defendant
had committed the murders. In that statement LaCue
acknowledged he had previously lied out of concern over
possible retaliation. At trial, LaCue testified the first
two taped statements were lies. The various versions of the
crime LaCue provided were the subject of extensive cross-
examination.

Subsequent to the killings, defendant fled the state. Later
arrested in Florida, he made a statement to Florida police
after being advised of his rights. In that statement,
defendant essentially asserted it was LaCue who made the
arrangements to meet the drug dealers and that LaCue killed
the two drug dealers. While admitting he accompanied LaCue
to the meeting with the dealers, defendant claimed only
LaCue got into the car and only LaCue did the shooting.
After he heard the gunshots, defendant claimed he ran from
the scene yelling at LaCue, "You are going to have the New
York people come after us now." Defendant asserted fear of
those "New York people" led to his flight to Florida.

The defense presented a different version of the events that
took place the night of the murders. Defendant told the
jury that on the evening of June 6, 1993, LaCue called him
looking for heroin. Defendant, an admitted drug dealer, had
dealt with the victims on prior occasions and knew them to
be drug suppliers. LaCue came to defendant's house where he
attempted to make contact with the victims by "beeping"
them. Eventually, LaCue contacted the victims from
defendant' home phone and set up the meeting at which the
killings took place.

According to defendant, when the victims arrived, defendant claimed he, LaCue, and Mo-T met them.  Defendant characterized his role as bodyguard for Mo-T, who is a drug dealer, although defendant claimed he was not armed at the time.

Defendant asserted that, as the three approached the car, one of the victims got out of it and entered the rear of the car.  Thereafter, although he never disavowed his role as Mo-T's bodyguard, defendant claimed he went across the street to speak with a female while LaCue and Mo-T spoke with the victims.  Just as his ten-minute conversation with the woman ended, defendant claimed he heard shots.  Defendant then ran.  As he did so, he turned and saw LaCue running towards him.  The two then ran together.  When they stopped running, defendant saw LaCue had a gun.  Defendant asked LaCue what had happened. According to defendant, LaCue responded, "Don't worry about it."  At that point the two separated.

Defendant testified that he then went to look for Mo-T.  He found him in a crowd gathered near the crime scene.  The two did not discuss the incident.  Defendant asserted he heard members of the crowd say the "New York boys" would be coming to get whoever was behind the shootings.

Defendant denied he went to Hazel Forrester's house.  Instead, he claimed to have wandered the streets until daybreak.  Defendant was allowed to testify that he believed Forrester testified as she did because she was afraid of Mo-T.

Following the killings, defendant contended he stayed in the area a week before fleeing to Florida after some friends told him "the Colombians [were] out to murder [him]."  Defendant denied telling the officers in Florida that he saw LaCue get into the victims' car.

As part of his defense, defendant offered the testimony of Mo-T's mother in an effort to exculpate himself and inculpate Mo-T.  The trial court, after an N.J.R.E. 104 hearing, rejected the proffer on grounds it was hearsay evidence which did not fall within any exception to the hearsay rule relied upon by the defendant.  After deliberating for almost two days, the jury returned its verdict of guilty on the charges that led to the judgment of conviction.

(Appellate Division Opinion, decided December 11, 1997, at pp. 2-7, RE 19).

## II. CLAIMS FOR HABEAS RELIEF

Hannah raises the following claims in his federal habeas petition: (1) ineffective assistance of counsel in failing to interview a potential witness with exculpatory evidence; (2) the trial court erred in excluding evidence of third party guilt; (3) ineffective assistance of trial counsel in cross-examining a witness; (4) ineffective assistance of trial counsel during summation; (5) prosecutorial misconduct; and (6) ineffective assistance of appellate counsel.

The State argues that petitioner's claims are without merit or fail to state a cognizable federal constitutional violation. The State also asserts that several of the claims are unexhausted. To the extent any of the claims asserted by Hannah in this petition were not exhausted in state court, this Court may opt to review such claims, and deny them on the merits pursuant to 28 U.S.C. § 2254(b)(2). Section 2254(b)(2) provides that "[a]n application for writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." See also Lambert v. Blackwell, 134 F.3d 506, 514-15 (3d Cir. 1997), cert. denied, 532 U.S. 919 (2001)(a district court may deny a petition on the merits, pursuant to 28 U.S.C. § 2254(b)(2), where

"it is perfectly clear that an applicant does not raise even a colorable federal claim").

## III. STANDARD GOVERNING REVIEW OF § 2254 CLAIMS

The Court recognizes that a pro se pleading is held to less stringent standards than more formal pleadings drafted by attorneys. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).  Thus, a pro se habeas petition should be construed liberally and with a measure of tolerance. See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Duarte v. Hurley, 43 F. Supp.2d 504, 507 (D.N.J. 1999).  Because Hannah is a pro se litigant, the Court will accord his petition the liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

established Federal law, as determined by the
Supreme Court of the United States; or

(2)     resulted in a decision that was based on an
unreasonable determination of the facts in light
of the evidence presented in the State court
proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme
Court explained that subsection (d)(1) involves two clauses or
conditions, one of which must be satisfied before a writ may
issue.  The first clause, or condition, is referred to as the
"contrary to" clause.  The second condition is the "unreasonable
application" clause.  Williams, 529 U.S. at 412-13.  In the
"contrary to" clause, "a federal court may grant the writ if the
state arrives at a conclusion opposite to that reached by [the
Supreme] Court on a question of law or if the state court decides
a case differently than [the Supreme] Court has on a set of
materially indistinguishable facts."  Id.  Under the
"unreasonable application" clause, a federal court may grant the
writ if "the state court identifies the correct governing legal
principle from [the Supreme] Court's decisions but unreasonably
applies that principle to the facts of [the petitioner's] case."
Id. at 413.  Habeas relief may not be granted under the
"unreasonable application" condition unless a state court's
application of clearly established federal law was objectively
unreasonable; an incorrect application of federal law alone is

9

not sufficient to warrant habeas relief.  Id. at 411.  See also Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000), cert. denied, 532 U.S. 980 (2001); Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that § 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891.  If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result.  Id.  AEDPA prohibits such de novo review. Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable.  Id.  In short, the federal court must decide whether the state court's application of federal law, when

10

evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court." Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings." Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

VI.  ANALYSIS

A.  Ineffective Assistance of Trial Counsel

The "clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), is the standard for ineffective assistance of counsel as enunciated in Strickland v. Washington, 466 U.S. 668 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct. Id. at 688-

11

89; Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005); Keller v.
Larkins, 251 F.3d 408, 418 (3d Cir.), cert. denied, 534 U.S. 973
(2001).  Counsel's errors must have been "so serious as to
deprive the defendant of a fair trial, a trial whose result is
reliable." Strickland, 466 U.S. at 688.  "In any case presenting
an ineffectiveness claim, the performance inquiry must be whether
counsel's assistance was reasonable considering all the
circumstances." Id.  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be
> highly deferential.  It is all too tempting for a
> defendant to second-guess counsel's assistance after
> conviction or adverse sentence, and it is all too easy
> for a court, examining counsel's defense after it has
> proved unsuccessful, to conclude that a particular act
> or omission of counsel was unreasonable.  A fair
> assessment of attorney performance requires that every
> effort be made to eliminate the distorting effects of
> hindsight, to reconstruct the circumstances of
> counsel's challenged conduct, and to evaluate the
> conduct from counsel's perspective at the time.
> Because of the difficulties inherent in making the
> evaluation, a court must indulge a strong presumption
> that counsel's conduct falls within the wide range of
> reasonable professional assistance; that is, the
> defendant must overcome the presumption that, under the
> circumstances, the challenged action "might be
> considered sound trial strategy."

Id. at 689 (citations omitted); see also Virgin Islands v.
Wheatherwax, 77 F.3d 1425, 1431 (3d Cir.), cert. denied, 519 U.S.
1020 (1996).

If able to demonstrate deficient performance by counsel,
petitioner must also show that counsel's substandard performance
actually prejudiced his defense.  Strickland, 466 U.S. at 687.

Prejudice is shown if "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. The reviewing court must evaluate the effect of any errors in light of the totality of the evidence. Id. at 695-96. Thus, the petitioner must establish both deficient performance and resulting prejudice in order to state an ineffective assistance of counsel claim. Id. at 697. See also Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

1. *Failure to Interview Potential Witness Deprived Petitioner of the Opportunity to Discover Exculpatory Evidence.*

Hannah contends that his counsel was deficient in failing to interview a witness, Maria Cosme, who could have provided exculpatory testimony at trial. Ms. Cosme would have purportedly corroborated petitioner's version of the incident and the "Mo-T did it" defense.[2] Her statement to the police allegedly conflicted with LaCue's account of the incident.[3] According to

_____

[2] Hannah contends that he had accompanied LaCue and Mo-T to greet the victim drug dealers, but stayed outside of the car. He then walked to a nearby corner to talk to a girl. While he was on the corner, he heard the shots.

[3] The report of Investigator Doherty, who interviewed Ms. Cosme, stated that Ms. Cosme was outside the house when she heard what she thought were firecrackers going off. She then saw two black males, one standing on the corner at Clinton and Sackett Streets, and the other coming from the direction of the victims' car. She heard one of the men say, "I got them already." She

13

petitioner, Ms. Cosme apparently told Investigator Doherty that
she and her daughter had seen a black male with short hair
standing on the opposite corner.  They heard gunshots as they
entered their house.  When they looked out the window, they did
not see the black man on the corner, but saw a different black
man, with braided hair, running with a suitcase in his hand.
LaCue wore his hair in braids or dredlocks.  Counsel never
interviewed Ms. Cosme or her daughter to determine if they could
bolster petitioner's defense.

Hannah raised this claim in his state PCR petition.  The PCR
court initially found that petitioner had failed to make a prima
facie showing, and therefore, denied an evidentiary hearing.
Hannah appealed and the Appellate Division held:

> We conclude that an evidentiary hearing should have been
> conducted on the single issue of trial counsel's failure to
> call Maria Cosme or her daughter at trial.  The hearing may
> well establish that neither Maria Cosme nor her daughter
> could be found at the time of trial or that neither woman
> was available due to illness or some other reason.  The
> record may establish that both women were too frightened to
> testify and may not have been beneficial to defense.  The
> record may also establish that trial counsel was unaware of
> these witnesses.  In any event, because the evidence tends
> to corroborate defendant's testimony of his position and his
> limited involvement in the incident, trial counsel's conduct
> regarding these witnesses should be further explored.

(Appellate Division Opinion, decided January 31, 2002, RE 32).

---

also told Doherty that one of the men was carrying a black
suitcase, but she did not say which one.  Both men had braids or
dredlocks.  Ms. Cosme then saw the men turn the corner on Sackett
Street and head east on Clinton Street.  She did not see either
man enter or leave the victims' car.

14

On April 11, 2002, an evidentiary hearing was conducted.
Maria Cosme was deceased, but her daughter, Jasmine Cosme-
Tarrats, testified at the hearing,[4] as well as Hannah's trial
counsel, Louis Serterides, Esq.[5]  The PCR court concluded that
Ms. Cosme's testimony would not have benefitted petitioner as to
the felony murder charges.  Specifically, the court noted that
Cosme's testimony might have aided Hannah with respect to the
knowing or purposeful murder charges (of which Hannah was
acquitted), but it would not have helped Hannah's defense as to
the felony murder charges.  In fact, the court found that Maria

---

[4]  Jasmine Cosme-Tarrats' testimony at the hearing was not
helpful to petitioner.  She testified that she had observed one
man on the northeast corner of Sackett and Clinton Streets before
the shootings.  She did not see anything after the shooting other
than a glimpse of a man running.  Her mother had pushed Jasmine
away from the window at that point.  Thus, Jasmine was unable to
describe the man, or indicate whether the man she saw briefly was
the same or a different man from the man she saw before she
entered her house.  (April 11, 2002 PCR Evidentiary Hearing
Transcript, 50:18-73:4).

[5]  Serterides testified that he had seen Investigator
Doherty's report with Ms. Cosme's statement.  He chose not to
interview Cosme because he believed her testimony could have
conflicted with the defense theory (conspiracy among LaCue, Mo-T,
and Ms. Forrester to implicate Hannah as the shooter instead of
Mo-T) and bolstered LaCue's testimony, thus leading the jury to
conclude that Hannah was one of the shooters.  Serterides further
stated that Cosme could have hurt Hannah's defense badly, and
would not have helped Hannah.  This was an informed decision
based on trial strategy, discussed with petitioner, who did not
insist at the time of trial that Cosme be called as a witness.
(April 11, 2002 PCR Evid. Hrg. Transcript, 9:9-24; 11:15-12:13;
18:8-19; 20:4-6; 33:23-34:14; 42:1-17; 43:1-7).

Cosme's testimony would have hurt petitioner's defense on the
felony murder charges, stating:

> Either Ms. Cosme could identify the defendant Hannah as the
> man on the corner, or she could not.  If she could identify
> the defendant Hannah as that man, that testimony would tend
> to corroborate the defendant's version of the event relative
> to the murder charges.
>
> If the defendant had been the man she saw on the corner and
> the time interval between the shots and the defendant's
> siting by Cosme [was] not too great, th[e]n arguably the
> defendant Hannah may not have been inside the car when the
> shots were fired.
>
> However -- and this is a major however -- that is not all
> Maria Cosme would have said.  She would also say that as the
> second man, by clear inference ... LaCue approached the
> defendant.  He did not say yo, yo, as defendant Hannah would
> testify, which could be considered neutral in terms of its
> connection to this event.  Rather, this man, LaCue, who
> would be admitting his involvement in the murders to the
> jury, according to this unconnected, civilian witness, said
> to the defendant Hannah ["]I got them already["] as he fled
> from the area of the car, carrying briefcase.
>
> That phrase, spoken between LaCue and Hannah, would, even to
> the dullest of jurors, clearly link the defendant Hannah to
> LaCue and to events that had just transpired in the car.
>
> Further, since LaCue did not specify what he meant by the
> term ["][them["] it would be reasonable for the jury to
> conclude that it was unnecessary for him to do so when
> speaking with Hannah because Hannah already knew what he was
> referring to, since [he] had participated in setting up the
> victims for the robbery, which resulted in their deaths and
> was therefore, guilty of felony murder.
>
> The second possibility here, that Maria could not identify
> the defendant as the man on the corner, also posed
> significant problems for this defendant.
>
> If Ms. Cosme stated that the defendant Hannah was not the
> man she saw, then this unconnected civilian's testimony
> would be in direct conflict with the defendant's critical
> trial testimony, that he was on the corner and not in the
> car.

16

Since Ms. Cosme was a casual observer of the event, and had no reason to lie, the jury would have no reason to disbelieve her. That would have had a disastrous effect on the jury's evaluation of the defendant Hannah's testimony, and could have resulted in convictions as to both murder and felony murder.

Even if Ms. Cosme had been equivocal in her identification, it could not have helped the defendant Hannah for the reasons just explained.

The jury would address the equivocal answer as admitting to the same two possibilities. It either was or was not the defendant Hannah on the corner. If it was, he would be guilty of felony murder. And if it was not, he'd be guilty of both murder and felony murder.

It was therefore unnecessary to interview Ms. Cosme, since what was known about her potential testimony, while of some assistance on the murder charge, would be damning on the felony murder charge.

Without Ms. Cosme's testimony, it was the defendant's word against that of the co-defendant LaCue. Given the three prior inconsistent statements of LaCue, his admitted involvement in the robbery and murder of the victims, and the favorable plea bargain he struck in exchange for his testimony, counsel knew he could severely damage LaCue's credibility.

The damage he could do to LaCue's testimony could, however, be undone if Cosme's testimony established the defendant's complicity in the robbery.

Counsel's strategic options were severely limited by the facts which he faced. His only practical option was to attempt to focus the case on LaCue's lack of credibility, attempt to make believable the frame-up of his client by LaCue, Mo-T and Ms. Forrester, and to downplay, as much as possible, or suggest as irrelevant, those other facts damaging to his client on the felony murder charge.

He was already facing the prospect of Ms. Flores' testimony linking the defendant Hannah to the setup, as well as the defendant's statement to Investigator Doherty wherein he admitted speaking with her to set up the transaction. And further, acting as a look-out when it occurred.

17

He knew the defendant Hannah's phone number and beeper
number were found on the body of the victim at the scene.
And he knew that [t]he defendant Hannah's version of the
event would differ materially from what he had told
Investigator Doherty.

Counsel wanted the jury's attention focused on Mo-T and the
conspiracy to frame the defendant.  Ms. Cosme's testimony
would only serve to focus the jury on the set-up of the
robbery and the defendant's complicity in it.  Such
testimony, as Mr. Serterides stated at the hearing ["]could
conceivably hurt him  - meaning the defendant -- badly["].

There was, simply put, no upside to Ms. Cosme's testimony.
Speculation regarding what investigation of her as a witness
would have revealed does not change this fact because what
we know she would have said was damning to the defendant on
the felony murder charges.

Counsel's decision not to investigate or call Ms. Cosme was
a sound exercise of professional judgment, made by an
experienced trial lawyer, faced with facts that
overwhelmingly established his client's guilt.

(June 6, 2002 PCR Transcript, 23:2-27:13).  See also Appellate

Division Opinion, decided November 7, 2003, at pp. 6-9 (RE 43).

The Appellate Division agreed with the PCR court, concluding

that trial counsel's decision not to investigate Maria Cosme's

testimony was a reasonable tactical decision.

Her testimony may have had a bearing on the purposeful
murder charges - of which he was acquitted - but it would
have undermined defendant's defense to the felony murder
charges.  Because we do not find counsel's representation to
have been deficient, the first prong of the Strickland/Fritz
test has not been met.

Moreover, defendant's own description of his role in the
crime, that he acted as lookout, set up the drug buy and
lured the victims to the crime scene, inextricably tied him
to the armed robberies and his felony murder convictions.
Neither the testimony of Maria Cosme nor her daughter, who
provided no evidence concerning the felony murder charges,
would have had any bearing on those facts.  Thus, the second

18

> prong of the <u>Strickland/Fritz</u> test – that if counsel had
> called Maria or Jasmine Cosme it would have altered the
> outcome of the trial with regard to the felony murder
> charges has not been established.

(Appellate Division Opinion, decided November 7, 2003, at pp. 9-
10, RE 43).

This Court likewise finds, based on the testimony of both
Sorterides and Cosme's daughter, and the statement by Cosme in
Investigator's Doherty's report, that the evidence clearly shows
Cosme's testimony would not have been helpful to Hannah, and
thus, belies Hannah's claim that she could have provided
exculpatory evidence. Indeed, there is no showing by Hannah that
his trial counsel was deficient in declining to investigate Ms.
Cosme's statement and possible testimony before trial. Counsel
admitted that he reviewed Cosme's statement and rejected further
investigation for her trial testimony as a strategic or tactical
decision in line with the defense plan based on third party
guilt, i.e., to implicate Mo-T as the second shooter. This was a
credible and reasonable strategy, based on an informed decision
by counsel, which should be accorded a strong level of deference.
<u>Strickland</u>, 466 U.S. at 689, 690-91 ("[S]trategic choices made
after thorough investigation of law and facts relevant to
plausible options are virtually unchallengeable").

Further, petitioner is unable to demonstrate any prejudice
resulting from counsel's decision not to investigate and call
Cosme as a witness at trial. Hannah's own testimony confirmed

19

his involvement in the robbery and consequently, the felony murders. Thus, Cosme's testimony would not have made any difference with respect to the felony murder charges, and could actually have made it worse for petitioner. At best, her testimony might have helped to acquit Hannah of the knowing and purposeful murder charges; however, the jury did acquit Hannah on those charges. Therefore, Hannah fails to establish both prongs of the Strickland test.

Finally, this Court finds nothing to indicate that the state court decisions on this issue were based on an unreasonable application of the facts in light of the evidence presented at trial and the PCR proceedings. Nor were the courts' decisions contrary to established federal law set forth in Strickland. Hannah has not demonstrated that the state court decisions, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. Matteo, 171 F.3d at 891. Accordingly, this ground of ineffective assistance of trial counsel will be denied for lack of substantive merit.

2. *Deficient Cross-Examination of Witness*

Next, Hannah argues that his trial counsel was ineffective based on his deficient cross-examination of witness, Rosa Flores. At trial, during cross-examination, counsel asked Flores whether she had heard the name "Rabb"[6] mentioned in conversations

---

[6]  "Rabb" is Hannah's street name.

20

involving the victims (who were Ms. Flores' husband and brother).
Flores answered yes, and counsel then asked her about the
conversations.  Flores replied, "My brother said he was telling
Fred you have to be careful because Rabb is a stick up kid."  (2T
129:3-15).  Counsel did not request a curative instruction by the
trial court directing the jury to disregard this hearsay
testimony.  (Petition, Ground Three).

Hannah raised this claim in his PCR proceedings.  The PCR
court found that this line of questioning by trial counsel was
intended to bolster Hannah's defense that he had merely arranged
a drug deal and did not intend to rob or kill the victims.

> ... considering the defense that was presented, that the
> incident here involved was merely to be a drug deal arranged
> by defendant, it was not unreasonable for counsel to
> anticipate the answer of the witness to be supportive of
> that defense.  The gist of the entire cross examination of
> this witness was a challenge to her testimony that she was
> unaware of her husband's drug dealing.
>
> Further, after making that implied charge to the jury, it
> was not unreasonable for counsel to examine the apparent
> prior relationship between the defendant and the victim.  It
> appears from the witness' direct testimony that the victim,
> who at that point in time had clearly been established to be
> a drug dealer, had both a prior and special relationship
> with the defendant.  That is apparent from his refusal to
> even speak with anyone else, even the co-defendant, on the
> phone.
>
> It could more than reasonably be anticipated by counsel that
> exploration of that relationship would produce testimony
> favorable to the defendant on at least two points.  First,
> that in fact this was, as far as the defendant was
> concerned, just another drug deal; and, two, that the victim
> was, if not a friend, then a frequent business associate of
> the defendant and a source of supply to him.  Each of those

21

facts would make it less likely that he would perpetrate or participate in a plan to rob or murder.

Insofar as the amelioration of the State is concerned, counsel did attack the witness' credibility on that statement in succeeding questions. He attempted to point out to the jury, consistent with her account to the jury, inconsistencies and continued to attack her credibility, despite the fact that the witness indicated that the victim had at some prior time made the remark complained of. The victim, on simply a phone call, left his home unarmed in the middle of the night to meet a friend over a financial matter. This was simply an unanticipated answer to a question asked on cross examination of a hostile witness.

While in hindsight it may appear to be a question better left unasked, in the absence of the answer, and given the defense, it was not unreasonable for counsel to attempt to gain corroborative evidence favorable to his defense from a State's witness. The attack upon the witness' credibility following the response was sufficient to ameliorate the impact of the negative statement.

(May 24, 2000 PCR Transcript, 16:12-18:10).

Thus, the PCR court clearly found that trial counsel's question on cross examination was a matter of trial strategy intended to reinforce the defense. On appeal, the Appellate Division agreed, finding that petitioner was unable to make a prima facie showing with respect to either prong of the Strickland test. (RE 32).

Decisions by trial counsel with regard to examination of witnesses are strategic by nature and necessitate a strong level of deference to the attorney's assessment. See Diggs v. Owens, 833 F.2d 439, 444-45 (3d Cir. 1987), cert. denied, 485 U.S. 979 (1988). Here, there was no deficient performance by counsel in his cross-examination of Ms. Flores because it was based on a

22

trial strategy to show a close relationship between petitioner and the victim, and to establish that Hannah was involved only in setting up a drug deal, not a robbery and murder. On hindsight it is easy to suggest that the question should not have been asked; however, it is apparent that the answer by Flores was unanticipated. Counsel promptly tried to rehabilitate its position by attacking the witness' credibility. There was no reason to seek a curative instruction, especially when there was no error.

Thus, this Court finds nothing to indicate that the state court decisions on this issue were based on an unreasonable application of the facts in light of the evidence presented at trial. Nor were the courts' decisions contrary to established federal law set forth in <u>Strickland</u>. Hannah has not demonstrated that the state court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified. <u>Matteo</u>, 171 F.3d at 891. Accordingly, this claim will be denied for lack of substantive merit.

3.   *Ineffective Summation*

Hannah next complains that his counsel was ineffective in failing to mention favorable testimony in his summation to the jury. In particular, Hannah alleges that taxicab driver, Charles Smith, had testified that he had seen only one person running from the victims' car. Yet counsel failed to mention this

23

critical testimony during summation, despite the fact that the taxicab driver's testimony contradicted LaCue's testimony. (Petition, Ground Four).

This claim was raised in Hannah's PCR petition.   The PCR court held that "[i]t is fundamental that the summation of counsel is not evidence."   (RE 14, 19:12-13).   The court further noted:

> The testimony here involved was presented to the jury for their consideration in the context of the defense. Apparently, they did not afford to this testimony the significance that petitioner asserts.   Counsel's failure to express that single response cannot be said to be a deficiency in his performance.   Even if it could, the evidence was before the jury and it must be presumed they evaluated it as they did with all the remaining evidence and found it unpersuasive.

(RE 14, 19:15-23).

This Court finds nothing in the record to indicate that the state court decision on this issue was based on an unreasonable application of the facts in light of the evidence presented at trial.   Nor was the court's decision contrary to established federal law set forth in <u>Strickland</u>.   Trial counsel had presented the cabdriver's testimony at trial and the cabdriver's statement was in evidence for the jury to consider.   Thus, counsel's misstep in forgetting to mention that single response during the summation, which is not evidential, cannot be said to be deficient performance.   Moreover, Hannah has not established prejudice.   The jury had heard the testimony of the cabdriver and

24

apparently attached little significance to it based on the other remaining evidence that overwhelmingly proved Hannah's presence at the scene, even if not by the car.  Consequently, Hannah has failed to demonstrate that the state court decision, when evaluated objectively and on the merits, resulted in an outcome that cannot be reasonably justified.  Matteo, 171 F.3d at 891. This ground for relief will therefore be denied.

B.   Trial Court's Exclusion of Evidence as to Third Party Guilt

In Ground Two of his petition, Hannah asserts that the trial court erred in excluding the testimony of a witness on the issue of third party guilt.  This claim was raised by Hannah on direct appeal.

The relevant facts on this issue were recounted by the state court below and this Court, affording the state court's factual determinations the appropriate deference under 28 U.S.C. § 2254(e)(1), will simply reproduce the New Jersey Appellate Division's factual recitation with respect to this claim:

> At the conclusion of the State's case, defendant offered the hearsay testimony of Mary Jones, Mo-T's mother.  In an N.J.R.E. 104(a) hearing, Jones testified that she knew defendant through her son.  She also knew that her son and defendant sold drugs.  How she knew all this is not clear. She testified to speaking with her son the day following the murders.  Her son called her and stated, "LaCue have just killed two drug suppliers, and I don't know what to do because I think the police may have my name, I mean have my beeper number."  Jones asked her son what the murders had to do with him.  Mo-T indicated that he would speak with her after talking to the police.  Later, Mo-T again called his mother.  Jones testified that he stated, "he just found out

that [defendant] ... had helped LaCue" and that "[defendant] was involved" in the murders.

The following day Jones again spoke with her son. This time he telephoned her. He stated he was calling from the police station and that the police were intending to tap her phone and should defendant call she should "keep him on the line." Jones asked her son why she should keep defendant on the line. He responded because "he wanted the police to get him because [defendant] was running from the police, that he was setting him up."

The next day Mo-T came to his mother's house. Upon questioning by his mother about the events that had transpired, he responded, "Ma, there is a lot of stuff going down, and I just found out that [defendant] was with the kid LaCue and that [defendant] had helped kill somebody."

Mo-T stayed with his mother for the next nine or ten days. During that time, according to Jones, a man whom she did not recognize was at her house at around two or three o'clock one morning. Jones overheard her son tell the unidentified man, "you have to find LaCue." The man returned at around 6:00 a.m. At that point, Mo-T told the man that he had given the police a statement that "[defendant's] brother had the weapons." Jones also overheard Mo-T and Arlene Forrester, his girlfriend, talking about the incident. "[Mo-T] said that [defendant] would have to take the weight. In order to get [defendant] off his back he would have -- [defendant] would have to be gotten rid of. The only way he know to get rid of [defendant] is to have [defendant] to take the weight for one of the murders that was committed." Jones testified that her son's reference to defendant being "on his back" related to a drug deal in which Mo-T had cheated defendant. She did not testify how she knew about that drug deal. She further testified that Mo-T told her defendant was not aware he had been cheated.

Jones also testified that her daughter told her Mo-T received the drugs taken from the drug suppliers who were killed. Later, during the time Mo-T was staying with his mother, she claimed to have seen Mo-T counting out money which totaled $10,600. Though she did not relate the foundation for her knowledge, Jones testified that about half of the money was intended for LaCue.

(RE 19, at pp. 8-9).

26

Defense counsel proffered Jones' testimony in support of the defense theory that LaCue and Mo-T had stolen the drugs and were dividing the proceeds, and that the two had conspired to commit the armed robbery, which had resulted in the death of two drug dealers. Counsel offered the obvious hearsay testimony of Ms. Jones under the co-conspirator hearsay exception. However, the trial court found no evidence of a conspiracy between LaCue and Mo-T to rob and murder the two victims and then blame Hannah for the crimes. The court also found no evidence that the hearsay statements were made in furtherance of that alleged conspiracy. Moreover, the court noted that Mo-T was in custody on other charges at the time and was available to testify at trial, stating:

> What the defense seeks to do is establish a separate conspiracy, an alternative version of the crime, and they certainly may attempt to do so, but the testimony of Mary Jones at this juncture, without proof, that a separate conspiracy existed between Messrs. LaCue and Thomas is not admissible.

(RE 19, at pg. 10).

Furthermore, the court found that the proffered testimony was irrelevant, confusing, and misleading, under N.J.R.E. 401 and 403. Some of the testimony served to inculpate petitioner in the crimes, in particular, Mo-T's statements that Hannah had participated in the murders and that Hannah's brother had the weapons. Other parts of the testimony only suggested that Mo-T was cooperating with the police. (RE 19, at pg. 10).

27

The Appellate Division concluded that the trial court's decision excluding Ms. Jones' testimony on the issue of third party guilt was not plain error.  The court acknowledged that the defendant has a constitutional right under the Fourteenth Amendment to offer probative evidence of third party guilt for the crimes in question.  State v. Koedatich, 112 N.J. 255, 297 (1988), cert. denied, 488 U.S. 107 (1989).  Thus, a third party's statement that inculpates the party in a crime may be admissible as a statement against interest if a direct link is shown to the crime for which the defendant is charged.  Id., 112 N.J. at 311.

In this case, the appellate court found that the statements cannot be regarded as inculpating Mo-T while exculpating petitioner.  Indeed, the statements show that petitioner participated in the murders with LaCue, or that LaCue committed them alone.  The court stated:

> While LaCue's sole commission of the murders tends to exculpate defendant, it contains two layers of hearsay - the statement from LaCue to Mo-T and the same statement from Mo-T to his mother.  That is a layering which vitiates a reliability premise.  Concededly, if LaCue told Mo-T that he just killed two people, that statement would be a statement against interest or an admission and an exception to the hearsay rule if Mo-T were testifying to the conversation. The same statement though, as related from Mo-T to his mother, is not one against Mo-T's interest and, therefore, is inadmissible hearsay.  Furthermore, even if the statements of Mo-T's mother were admissible, it does not rise to the level of a "direct link" to the conviction envisioned by the Supreme Court in Koedatich, supra, 112 N.J. at 311, to admit the evidence as a statement against interest.

28

The same problem holds true for the testimony that Mo-T
received the benefit of the drugs stolen from the victims.
The source of Jones' information was her daughter.   Again,
the statement from Jones' daughter to her was hearsay and
does not fall within any exception.

Finally, Mo-T's cooperation with the police and his
purported statements, including the one that he was going to
"set up" defendant, clearly, in the context of the entire
conversations, indicated only that Mo-T was cooperating with
the police.   There is no indication of any plan to frame
defendant for the crimes charged.   As such, the statements
were irrelevant.

(RE 19, at pp. 12-13).   Thus, the court concluded that the trial

court's decision to exclude Jones' testimony was not a mistaken

abuse of discretion that would support a plain error conclusion.

(Id., at pg. 13).

Generally, matters of state law and rules of procedure and

evidence are not reviewable in a federal habeas petition.   The

Supreme Court has stated that "it is not the province of a

federal habeas court to reexamine state-court determinations on

state-law questions."   Estelle v. McGuire, 502 U.S. 62, 67-68

(1991).

Federal courts must afford the states deference in its

determinations regarding evidence and procedure.   See Crane v.

Kentucky, 476 U.S. 683, 690 (1986)("we have never questioned the

power of the States to exclude evidence through the application

of evidentiary rules that themselves serve the interests of

fairness and reliability, even if the defendant would prefer to

see that evidence admitted").   It is well-established that "a

29

state court's misapplication of its own law does not generally raise a constitutional claim. The federal courts have no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997)(citations omitted), cert. denied, 522 U.S. 1109 (1998).

However, evidentiary rulings may violate due process when the petitioner "was denied fundamental fairness at trial." Hutchins v. Hundley, 1991 WL 167036 at *4 (D.N.J. Aug. 22, 1991)(Wolin, J.)(citations omitted); see also Kontakis v. Beyer, 19 F.3d 110, 120 (3d Cir. 1994), cert. denied, 513 U.S. 881 (1994); Lisenba v. California, 314 U.S. 219, 228, 236 (1941)(holding that state court's evidentiary rulings may form the basis for habeas relief when they "so infused the trial with unfairness as to deny due process of law"). See also United States v. Agurs, 427 U.S. 97, 108 (1976)(For a habeas petitioner to prevail on a claim that an evidentiary error amounted to a deprivation of due process, he must show that the error was so pervasive as to have denied him a fundamentally fair trial).

The appropriate inquiry is "whether the claimed error of law is a fundamental defect which inherently results in a complete miscarriage of justice or in an omission inconsistent with the rudimentary demands of fair procedure." Hutchins, 1991 WL 167036 at *4 (citing United States v. De Luca, 889 F.2d 503, 506 (3d

30

Cir. 1989), <u>cert.</u> <u>denied</u>, 496 U.S. 939 (1990))(other citations omitted).   The Supreme Court has further stated that "an otherwise valid conviction should not be set aside if the reviewing court may confidently say on the whole record that the constitutional error was harmless beyond a reasonable doubt." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 681 (1986).   An error is not harmless if "it aborts the basic trial process or denies it altogether."   <u>Hutchins</u>, 1991 WL 167036 at *5 (citing <u>Rose v. Clark</u>, 478 U.S. 570, 578 n.6 (1986)).

In this case, the Court finds that the state court's evidentiary ruling with respect to the exclusion of Jones' testimony did not violate Hannah's right to due process.   The hearsay statements did not serve to inculpate Mo-T and exculpate petitioner as suggested by petitioner.   There was no evidence of a conspiracy between Mo-T and LaCue to blame Hannah for the shootings that would allow for these statements to be admitted via the co-conspirators hearsay exception.   Finally, there was no direct link between Mo-T and the robbery and murders.   Thus, under state rules of evidence, Jones' hearsay testimony was properly excluded under the hearsay rule.   The trial court committed no errors of a constitutional dimension and a review of the whole record demonstrates that the trial process was

31

fundamentally fair.[7]  Accordingly, this ground for a writ of habeas corpus will be denied.

C.  Prosecutorial Misconduct

Habeas review of a claim based on prosecutorial misconduct is limited to determining whether the conduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  "The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982).  If it does not infect the entire trial, misconduct alone is not enough to warrant a new trial. Id. at 220.  "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments [or conduct] standing alone, for the statements or conduct must be viewed in context." United States v. Young, 470 U.S. 1, 11 (1985).

However, the U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> He may prosecute with earnestness and vigor – indeed,
> he should do so.  But, while he may strike hard blows,
> he is not at liberty to strike foul ones.  It is as

_____

[7]  Hannah's reliance on Chambers v. Mississippi, 410 U.S. 284 (1973) is unavailing.  The factual circumstances surrounding third party admissions of guilt in Chambers are substantially different from the hearsay statements in this case wherein no admission of guilt had actually been uttered by Mo-T.

> much his duty to refrain from improper methods
> calculated to produce a wrongful conviction as it is to
> use every legitimate means to bring about a just one.
> ... Consequently, improper suggestions, insinuations,
> and, especially, assertions of personal knowledge are
> apt to carry much weight against the accused when they
> should properly carry none.

Berger v. United States, 295 U.S. 78, 88 (1935).

"Supreme Court precedent counsels that the reviewing court must examine the prosecutor's offensive actions in context and in light of the entire trial, assessing the severity of the conduct, the effect of the curative instructions, and the quantum of evidence against the defendant." Moore v. Morton, 255 F.3d 95, 107 (3d Cir. 2001).

In this case, Hannah claims that the prosecutor's comments during summation violated his right to due process. Essentially, petitioner takes issue with the prosecutor's comments that the "Mo-T thing" is absurd and for the jury not to get caught up in it. Hannah raised this claim on direct appeal. The Appellate Division found the argument without merit. "The large majority of the prosecutor's comments amounted to nothing more than an attack on the theory advanced by the defense. The defense having been raised, the prosecutor was free to argue its absurdity." (Appellate Division Opinion, filed December 11, 1997, at pp. 15-16, RE 19). Moreover, the court noted that defense counsel did not object to these comments, demonstrating that the remarks clearly were not out of bounds. (Id., at pg. 16).

33

This Court finds that the prosecutor's comments or remarks during summation did not have the capacity on their own to so infect the trial with unfairness as to make the resulting conviction a denial of due process. The prosecutor's comments simply challenged the defense raised by Hannah. As such, the Court finds no error of constitutional dimension; it was nothing more than fair commentary. The decision of the Appellate Division is not contrary to, and does not involve an unreasonable application of, clearly established federal law;[8] nor is it based on an unreasonable determination of the facts in light of the overwhelming testimonial evidence presented in the state court proceedings. Accordingly, this claim will be denied.

## D. Ineffective Assistance of Appellate Counsel

In this last ground for habeas relief, Hannah contends that his appellate counsel was ineffective for failing to raise on appeal the argument that the trial court erred in its ruling to allow a juror to remain on the jury.[9] The trial court had

---

[8]  This Court acknowledges that the Appellate Division analyzed petitioner's claim under state law standards.  However, the state law cited by the Appellate Division is substantially similar to the federal standard cited herein.

[9]  Juror No. 12 had complained to the court about pressure from the juror's employer who was short-handed while the juror remained on the jury.  The juror was working at night to keep up, but it was not enough.  Juror No. 12 stated to the court: "I don't feel too fair at this point. I have a lot of disagreement with the jury and ..."  (8T 5:15-8:3).  Thereafter, the court contacted the juror's employer and noted on the record that the employer's concern had been obviated.  (9T, 4:25-5:1).

determined that Juror No. 12 should remain on the jury because the court was convinced the juror could be fair and continue deliberations. The juror was "clearly competent, articulate and possessed of all faculties necessary to be a fair and conscientious juror." The judge further held that a juror's desire to return to work is not a compelling circumstance for excusing a juror. (RE 11, 4:19-7:6).

The Supreme Court has held that the Due Process Clause of the Fourteenth Amendment guarantees a defendant the effective assistance of counsel on a first direct appeal as of right. Evitts v. Lucey, 469 U.S. 387 (1985). Claims of ineffective assistance of appellate counsel are evaluated under the Strickland standard. See Lewis v. Johnson, 359 F.3d 646, 656 (3d Cir. 2004); Wright v. Vaughn, 2004 WL 1687865, *6, n.10 (E.D. Pa. July 26, 2004). Appellate counsel does not have a duty to advance every nonfrivolous argument that could be made, see Jones v. Barnes, 463 U.S. 745, 754 (1983), but a petitioner may establish that appellate counsel was constitutionally ineffective "if he shows that counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994).

Moreover, in order to prevail on a claim that appellate counsel was ineffective, a petitioner must show not only that counsel's performance fell below an objective standard of

reasonableness, but also that there was a reasonable probability, but for counsel's deficiency in raising the arguments on appeal, that the conviction would have been reversed on appeal.  <u>See</u> <u>Buehl v. Vaughn</u>, 166 F.3d 163, 173-74 (3d Cir. 1999), <u>cert.</u> <u>dismissed</u>, 527 U.S. 1050 (1999).

Based on review of the record, this Court finds that Hannah fails to establish deficient performance by appellate counsel. There was no basis to have the juror removed, and the issue was certainly weaker than any other claim that was raised on direct appeal, if not frivolous.  Hannah also fails to demonstrate how the alleged failure by appellate counsel to raise the juror issue on direct appeal would have had any reasonable potential for affecting the outcome of the appeal.  The claim was raised in Hannah's PCR proceedings and rejected out of hand, indicating that it also would not have been successful if it had been raised on direct appeal.  Therefore, this Court cannot conclude that the determination of this issue by the state courts resulted in a decision that was contrary to, or involved an unreasonable application or determination of law or fact.  <u>Williams v. Taylor</u>, <u>supra</u>.  Hannah's ineffective assistance of appellate counsel claim will be denied accordingly.

V.   <u>CERTIFICATE OF APPEALABILITY</u>

This Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate

Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## CONCLUSION

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.  An appropriate Order follows.

_____
WILLIAM H. WALLS
United States District Judge

DATED: 11 January  2005

37